Jennifer Pafiti (SBN 282790)
**POMERANTZ LLP**
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6449
E-mail:   jpafiti@pomlaw.com

Jeremy A. Lieberman
Matthew L. Tuccillo
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
Email: jalieberman@pomlaw.com
        mltuccillo@pomlaw.com

(*additional counsel on signature page*)

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM MONACHELLI and RANDALL A. ARVIDSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>HORTONWORKS, INC., ROBERT G. BEARDEN, and SCOTT J. DAVIDSON,<br><br>Defendants. | Case No. 3:16-cv-00980-SI<br><br>CLASS ACTION<br><br>**FIRST CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.     Lead Plaintiff Randall A. Arvidson, along with original Plaintiff William Monachelli (together, the "Plaintiffs"), individually and on behalf of all the other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the ongoing investigation conducted by and through their attorneys, which included, *inter alia*, review of Securities and Exchange Commission ("SEC") filings, press releases, transcripts of earnings calls, and other public statements by Hortonworks, Inc. ("Hortonworks") and the other Defendants; interviews with numerous confidential witnesses; and review of other publicly available information, including pertinent press coverage, analyst reports, and Hortonworks' stock chart.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

2.     This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired the common stock of Hortonworks between August 5, 2015 and January 15, 2016 (the "Class Period"), both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class"). Excluded from the Class are Hortonworks and its affiliates, directors and officers of Hortonworks and their family members, and the Individual Defendants and their family members.

## OVERVIEW

3.     Hortonworks was founded in 2011 and is headquartered in Santa Clara, California.  Hortonworks is one of three major "Hadoop" vendors and the only one that is

publicly-traded, following its initial public offering in December 2014.  Its stock trades on the NASDAQ under the ticker symbol "HDP."

4.      Hortonworks focuses on the development, distribution, and support of the Hadoop open source project in the United States and internationally, which is an open source software used to link large numbers of computers into highly efficient large scale data systems. Hortonworks offers Hortonworks Data Platform, an enterprise-grade data management platform that purportedly enables its customers to capture, store, process, and analyze increasing amounts of existing and new data types without the need to replace their existing data center infrastructure, as well as Hortonworks DataFlow, a complementary Hadoop implementation tool that incorporates Niagrafiles technology.  It also provides Hortonworks Sandbox, a personal, portable, and free to use Hadoop environment purportedly designed to offer the easiest way to get started with Enterprise Grade Hadoop and the Hortonworks Data Platform.  Based on these software offerings, Hortonworks provides support subscription, and training and consulting services – from which it derives substantially all of its revenues.

5.      During the Class Period, Hortonworks investors and analysts covering Hortonworks were paying close attention to how it was going to meet its capital obligations and operating expenses, particularly as regards its skyrocketing personnel costs in light of several large business deals, some of which were unplanned.  If Hortonworks could meet those costs with existing cash and cash equivalents, or cash derived from sales of subscriptions and consulting services, then its growth would truly drive up its stock value for existing shareholders. If, on the other hand, Hortonworks could not, such that another public offering was necessary, then its growth was only being secured at the high price of dilution of its existing shareholders.

6.     According to numerous confidential witnesses ("CWs"), before and during the Class Period, Defendants knew that its skyrocketing operating expenses, particularly those related to personnel, were outstripping its available cash, for a multitude of reasons, including, among others, the overwhelming impacts of significant deal renewals with major clients like Microsoft, new partnerships like the pre-Class Period one with competitor Pivotal Software, Inc., and major acquisitions like that of Onyara in August 2015.  The Pivotal deal not only required extensive new hiring, it was also a significant drag on cash because it was based on a different pricing methodology that led to very long delays in payments that came to be commonly referred to as "latent revenue" by October 2015.   The Onyara acquisition also meant significant absorption of new employees.  At the same time, in the latter half of 2015, due to concerns including the quality of customer service, Hortonworks shifted from a staffing model based largely on non-employee, independent contractor consultants to one based on in-house employees.  These factors and more led to a massive upswing in hiring and a huge expansion of Hortonworks' employee base and personnel costs through the latter half of 2015.

7.     At the same time, the CWs said that Hortonworks' leadership struggled to manage its cash, a central concern to its business.  By October 2015, there were already major concerns that Hortonworks needed more cash, and Defendant Davidson stated on an "All Hands Call" that "Revenue is more latent than we have anticipated."   In this context, Defendants decided that Hortonworks needed to raise more money.  CW1 recalled pressures within Hortonworks to seek new capital were rumored in late 2015, and CW2 recalled an email to employees and internal announcement during an "All Hands Call" internally disclosed that Hortonworks would pursue a second public offering sometime *before* CW2 left Hortonworks in late November 2015.  This

announcement occurred when Hortonworks was greatly struggling with its cash issues, which led to layoffs just after the Class Period, in February 2016.

8.      Entering the Class Period, analysts were carefully monitoring Hortonworks' cash position, and throughout it, they frequently sought updates from Defendants.  Yet, during the Class Period, Defendants provided a steady stream of false and misleading statements as to the strength of Hortonworks' cash holdings, its revenues and cash being derived from sales to customers, and its ability to meet capital needs from these sources of cash.  For instance, in Forms 10-Q filed on August 13, 2015 and on November 12, 2015, Defendants falsely and misleadingly stated, "***We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for the next 12 months***."[1]  Indeed, as late as November 16, 2015, Defendant Davidson boasted, "***We have more cash now than we did when we went public***," and on December 1, 2015, Defendant Bearden touted, "***We have a model that today shows us getting the cash profitability in early 2017.  Even with the two acquisitions that we've done, we're very comfortable with that model***," adding, "***We're comfortable operating on that***."

9.      Thus, the markets were shocked when, on January 15, 2016, the Friday night before Martin Luther King, Jr. Day weekend, Hortonworks announced via a press release and a completed Form S-3 filed after-hours with the SEC that it had already retained six investment banks to oversee a ***$100 million secondary equity offering***, stating that it intended to use the net proceeds for "***working capital and other general corporate purposes***."  Significantly, the Form

---

[1]  All bolded, italicized and/or underlined text herein, if used within a quotation, indicates emphasis added unless otherwise noted.

S-3 expressly stated that Hortonworks had no specific or preliminary plans to use the proceeds for technological enhancements to its product offerings and no agreements or commitments in place to acquire or invest in complementary businesses.  It simply needed more cash to meet its working capital needs – ***directly contrary to Defendants' Class Period statements***.

10.     On this news, Hortonworks's stock fell $6.13, or nearly 37%, to close at $10.44 on January 19, 2016, the next trading day after the holiday weekend.

11.     As a result of Defendants' false and/or misleading statements as alleged herein, Hortonworks securities traded at inflated prices during the Class Period.  After corrective disclosure of Defendants' false and/or misleading statements, Hortonworks's stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and other Class members.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).  Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b), as Defendant Hortonworks is headquartered in this district and many of the acts and practices complained of herein occurred in substantial part in this district.

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

15.     Lead Randall A. Arvidson purchased or otherwise acquired Hortonworks common stock as described in Lead Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

16.     Plaintiff William Monachelli purchased or otherwise acquired Hortonworks common stock as described in Plaintiff's prior-submitted certification and was damaged by the conduct alleged herein.

17.     Defendant Hortonworks is incorporated in Delaware and is headquartered at 5470 Great America Parkway, Santa Clara, CA 95054. Defendant Hortonworks made materially false and misleading misstatements and omissions as alleged herein.

18.     Defendant Robert G. Bearden, as described herein, served as Hortonworks' Chairman and Chief Executive Officer (CEO) during the Class Period. Defendant Bearden made materially false and misleading misstatements and omissions as alleged herein.

19.     Defendant Scott J. Davidson, as described herein, served as Hortonworks' Chief Financial Officer (CFO) before and into the Class Period. Defendant Davidson made materially false and misleading misstatements and omissions as alleged herein.

20.     Defendants Bearden and Davidson are sometimes together referred to herein as the "Individual Defendants."

**NON-PARTY CONFIDENTIAL WITNESSES**

21.     CW1 was a Strategic Accounts Director at Hortonworks from June 2014 to February 2016 based in Tucson, Arizona, who reported to Senior VP of Sales Jeff Miller, who was based in its Santa Clara headquarters. CW1 also had the title Global Accounts Manager. CW1 was one of a dozen employees servicing major accounts for Hortonworks, and CW1

oversaw 25 such accounts in the southwest United States. CW1 had direct, regular access to Defendant Davidson, including on "All Hands Calls."

22.     CW2 worked as a Senior Global Manager for Customer Relations at Hortonworks from February 2015 to December 2015, based at its Santa Clara corporate headquarters. CW2 also regularly participated in "All Hands Calls."

23.     CW3 was a Senior Director for Corporate Development at Hortonworks from May 2014 to February 2016, based in Houston, Texas, reporting first to its VP for Strategic Initiatives and later to its VP for Global Channels & Alliances.

24.     CW4 worked as a Communications Manager at Hortonworks from September 2015 to February 2016 at its Santa Clara corporate headquarters, reporting to its VP of Global Communications. Prior to that, CW4 worked at Hortonworks as a Marketing Operations Specialist from January 2015 to June 2015 and as a Digital Content Specialist from June 2015 to September 2015.

25.     CW5 worked as a Senior Global Payroll Manager at Hortonworks from November 2015 to April 2016 at its Santa Clara headquarters, reporting to its Director of Accounting.

## SUBSTANTIVE ALLEGATIONS

### Hortonworks' Business

26.     Founded in 2011 and is headquartered in Santa Clara, California, Hortonworks focuses on the development, distribution, and support of the Hadoop open source project in the U.S. and internationally. Hortonworks is one of three major Hadoop vendors and the only one that is publicly-traded. Its stock trades on the NASDAQ under the ticker symbol "HDP." Among other things, it offers Hortonworks Data Platform, an enterprise-grade data management

platform enabling customers to capture, store, process, and analyze increasing amounts of existing and new data types without replacing existing data center infrastructure, and Hortonworks Sandbox, a personal, portable, and free-to-use Hadoop environment offering an easy way to get started with Enterprise Grade Hadoop and the Hortonworks Data Platform.  For its large corporate clients, Hortonworks provides support subscriptions and training and consulting services – from which it derives substantially all of its revenues.

27.     According to CW1, Hortonworks took customers from competitors accustomed to paying contractually for a broad range of general IT services and negotiated new subscription-based arrangements of support built on its Hadoop system and services.  Before and during the Class Period, Hortonworks was pushing the large-scale IT industry to pay subscription fees for expert support of new, more efficient systems, built on Hadoop and other open source software Hortonworks was mastering.

### Hortonworks' Need For Additional Capital

*Defendants' Tight Oversight Of Hortonworks Business Plan, Expenses, And Cash*

28.     According to CW1, Defendant Davidson was directly and intimately involved in managing Hortonworks' cash flow, which he regularly communicated to senior sales staff through monthly "All Hands Calls," which were conference calls into which employees would patch in and listen to updates on things like quarterly updates to Hortonworks' business plans or revisions to compensation that occurred every six months.

29.     CW1 participated in numerous "All Hands Calls" with sales staff, on which Hortonworks' expenses and strategy were frequently discussed.  CW1 said that Defendant Davidson spoke to Hortonworks's goals, and managing expenses was always a top concern.

30.     According to CW1, all of Hortonworks' business transactions were managed using, Salesforce.com, a cloud-based accounting system, and employees had varying levels of access to the records stored therein.  CW1 used the system to record sales and business-related expenses.  Thus, Hortonworks' cash burn rate was visible and readily accessible to its highest-level employees, including Defendants Davidson and Bearden, through electronic records that were updated in real time.

### *Hortonworks' Escalating Costs*

31.     Hortonworks needed to pay top dollar to attract high-caliber employees in a highly-competitive environment. CW5 said that a Hortonworks sales staff employee could earn $500,000 or more per year, including commissions.  As a senior employee overseeing major accounts, CW1 earned $1 million per year in salary, commission, and bonuses.

32.     In this context, CW1 stated that Hortonworks attempted to be frugal with travel expenses for sales staff, constantly trying to control those costs.  For instance, CW1 stated that Hortonworks changed CW1's sales territory to the southwest United States so as to decrease travel costs, given CW1's residence in Tucson, Arizona.  Yet, CW1 said that such measures failed to control costs, due to a multitude of reasons.

33.     First, according to CW1, Hortonworks had been forming new partnerships to acquire customers, develop its services, and improve its Hadoop-based IT subscription services for businesses.  One such partnership was with Microsoft, announced back in 2011, pursuant to which Microsoft had agreed to build Hortonworks' Hadoop support into Azure, a popular cloud-based server product for businesses.  The Microsoft partnership was renewed periodically, including during the Class Period.

34.   <u>Second</u>, as described by CW1, in April 2015, Hortonworks formed a partnership with a major competitor, Pivotal Software, Inc. ("Pivotal"), a company that had formed its business around selling IT support to large businesses seeking to create or expand huge or complex data systems.   Pivotal had focused on and made inroads with large retailers, like Walmart, using the same open-source Hadoop software in some of its projects as Hortonworks used.   However, according to CW1, unlike Hortonworks, Hadoop was not the centerpiece of Pivotal's expertise or success.   CW1 said that Hortonworks struck a deal whereby Pivotal would remove Hadoop from its repertoire of services and instead use Hortonworks to provide Hadoop to its customers, many of them significant retailers, who would effectively become Hortonworks customers for support where Hadoop was the software platform chosen.   Pivotal's clients, many contemplating large projects built upon Hadoop software, were largely excited by the prospects of getting Hortonworks' support for the complex Hadoop systems they wanted.   However, according to CW1, for Hortonworks, the Pivotal deal was an unplanned investment that may have placed too much pressure on Hortonworks, requiring the additional hiring of more field consultants and staff.

35.   Worse, CW1 said the Pivotal deal turned out to be a much longer-term return on investment for Hortonworks than expected.   Whereas Hortonworks sells its services as a subscription for software and IT support, Pivotal had customers under contract for services, which necessitated a change in customer pricing.   CW1 said Hortonworks had planned to generate significant new revenue from the Pivotal partnership in the spring of 2015, which did not occur.   Instead, CW1 said Hortonworks executives knew by October or November 2015 that many Pivotal-related accounts for Hortonworks were seen as not producing revenue for six more months and began referring to this problem as "latent revenue."

36.   <u>Third</u>, CW1 said that in late 2014, the National Security Agency (NSA) had surprised the tech industry by making public the source code for a software system called Niagrafiles (nicknamed "NiFi"), a two-way, real-time, large-scale data "orchestration" system developed for the NSA's foreign intelligence mission, and contributing it to the open source community.  CW1 said Hortonworks began expanding its staff to do and develop NiFi, which was an unplanned investment.  According to CW1, Hortonworks adapted NiFi to a software component it called Hortonworks DataFlow, which complements Hadoop implementations and becomes part of the subscription service provided to customers.  However, CW1 said that Hortonworks executives and engineers decided that NiFi was bigger for future large-scale data work than Hadoop itself and wanted to be on top of it.  Thus, in 2015, Hortonworks acquired Onyara, a company formed by former NSA employees who had developed NiFi.  CW1 said the Onyara acquisition meant a significant number of new employees taken on by Hortonworks, and that the burden was fully known by its top executives.  The Onyara acquisition closed on August 31, 2015.

37.   <u>Fourth</u>, all these factors and more prompted a large increase in Hortonworks' employee base, and by extension, its expenses before and during the Class Period.  CW1 said that whereas Hortonworks had historically relied upon non-employee independent contractors for much of its labor, due to reliability and other concerns, it made a major decision to seek to replace its entire consulting staff with paid employees.  CW1 said that Hortonworks' consultants were the computer engineers who understood Hadoop and related technologies, but as non-employees, they were proving to be unreliable for good support as Hortonworks' customer obligations grew.  For instance, at one point in 2015, CW1, whose big accounts were generating many millions in revenue, had only two full-time support employees, which CW1 described as

"ridiculous," so Hortonworks decided that CW1 needed a sixfold increase in support staffing. CW1 stated that an ongoing effort to replace contractors with employees began in the latter half of 2015 and continued into 2016. CW1 said that Hortonworks executives were aware of the cost of this hiring model.

38.     The other CWs corroborate the scope and timing of Hortonworks' massive hiring spree. CW4 observed a huge expansion of Hortonworks' staff in 2015. CW2 similarly stated that Hortonworks was expanding rapidly in the leadup to November 2015, hiring many new employees and opening new offices around the world, in an atmosphere of a major startup in an unbridled expansion. CW3 also observed a massive hiring increase through the latter half of 2015, as part of a doubling down on professional services, with more full-time employees being hired to service accounts. By November 2015, CW5 observed a low attrition rate while Hortonworks was firing 50 to 100 employees a month, a roughly equal mix of sales, information technology, and support staff, and opening new office locations all over the U.S. and internationally.

*Hortonworks' Struggles To Manage Cash*

39.     Not surprisingly, in light of these facts, CW1 said that managing cash was central to Hortonworks' business.

40.     Yet, CW1 recalled major concerns in October and November 2015 that Hortonworks needed more cash. In that period, Defendant Davidson admitted during an "All Hands Call" on which CW1 participated, that "Revenue is more latent than we have anticipated."

*Hortonworks' Undisclosed Decision to Raise Capital*

41.     In this context, unbeknownst to Hortonworks investors, Defendants decided that Hortonworks needed to raise more money.

42.     CW1 recalled that pressures within Hortonworks to seek new capital were rumored in late 2015.

43.     CW2 is certain that there was an internal announcement made **before** CW2 left Hortonworks at the end of November 2015 that Hortonworks intended to pursue a second public offering of stock to raise capital.   CW2 could not recall if it was Defendant Bearden or Defendant Davidson who made the announcement, but is sure that there was an email to Hortonworks employees and the news came in an "All Hands Call" without much discussion.

44.     This announcement came amidst a dire cash crunch at Hortonworks on the heels of its massive hiring binge throughout 2015.   By the time CW1 left Hortonworks in February 2016, many Pivotal accounts were non-revenue producing for at least another six months.   Yet, CW4 observed that Hortonworks was still spending a lot of money, such that, by February 2016, it was struggling financially and laying off staff; at that time, CW4 was told that Hortonworks was restructuring its marketing staff through layoffs, and CW4 was let go.   CW3's position was also eliminated in February 2016, as part of an overhaul of business development.

45.     Defendants omitted the foregoing facts from their Class Period statements reference herein, which were materially false and misleading, as discussed *infra*.

### *In The Dark, Analysts Carefully Watched Hortonworks' Cash Management*

46.     Entering the Class Period, analysts were carefully eyeing Hortonworks' cash position, looking to Defendants for guidance and reassurance that it could continue to generate and maintain the cash necessary to sustain its expansive growth.   For instance, analyst reports in early August 2015 highlighted concerns over Hortonworks' cash management, like a SIG Susquehanna Financial Group report expressing concerns because "The growth trajectory of HDP is certainly an attraction, but HDP is one of several vendors vying for share…and burning a

significant amount of cash to do so." and a Cowen and Company report the same day expressing concerns over Hortonworks' high customer acquisition costs and "related cash burn."

### Defendants' False and Misleading Statements During The Class Period

47.     The Class Period begins on August 5, 2015, when Defendants began making a series of false and misleading statements, contrary to the facts as then known to them, touting Hortonworks' exploding growth in customers and subscriptions while reassuring investors of its ability to satisfy rising capital needs and personnel costs through existing cash and cash equivalents coupled with cash derived from sales of subscriptions and professional services.

48.     On August 5, 2015, Hortonworks issued a press release (the "8/5/2015 Press Release"), which it filed as an attachment to a Form 8-K signed by Defendant Davidson and filed with the SEC the same day (the "8/5/2015 8-K").  It stated that Hortonworks had cash and cash equivalents as of June 30, 2015 of $30.769 million (as compared to $129.084 million as of December 31, 2014).  It also quoted Defendant Bearden as touting Hortonworks' growth in customers and subscriptions:

> We are very pleased with our second quarter performance which was highlighted by support subscription revenue growth of 178% year-over-year and solid customer momentum with the addition of 119 new support subscription logos.  As leading enterprise organizations continue to deploy the Hortonworks Data Platform in production at scale, as evidenced by our 144% dollar-based net expansion rate over the trailing four quarters, we could not be more thrilled to serve as their trusted IT partner during this transformational period in the data management industry.

49.     On August 6, 2015, Hortonworks held its Q2 2015 earnings teleconference, on which Defendants Bearden and Davidson spoke (the "Q2 2015 Earnings Call").  On it, Defendants made materially false and misleading statements, including:

(a)     Defendants touted Hortonworks' revenues, including in particular its support subscription revenues, and its cash.  Bearden stated, "[R]evenue increased 154% year-over-year

to $30.7 million.  Support subscription represented 71% of total billings in the quarter and was up 120% year-over-year.  Support subscription revenue grew 178% year-over-year, representing acceleration from the 117% year-over-year growth in Q1."   Davidson added, "[S]upport subscription billings in Q2 were up 120% year-over-year and represented 71% of total billings. Q2 total revenue was $30.7 million, up 154% year-over-year, support subscription revenue was $18.8 million, up 178% representing 61% of total revenue."   Davidson highlighted that Hortonworks had $144 million in total cash plus investments.

(b)     During analyst questioning, Defendants specifically highlighted the growing portion of larger deals as contributing to revenue.  Specifically, when asked "[W]hat drove the strength of this quarter on the subscription side?" by an analyst, Davidson pointed to two things: that Hortonworks "intend to have bigger Q2s and Q4s and lighter Q1s and Q3s" and the "larger proportion of $1 million deals…we did $4 million in Q1, we did $5 million deals in Q2…" When asked, "[A]s a quick follow-up on the large million dollar deals, pipeline looking into Q3, second half of the year still looking healthy on the large deal side or given some of those semi-annual kind of comp plans, was that skewed somewhat here this quarter?" by an analyst, Davidson said, "[T]ypically they follow up a form with the comp plans - - it looks like a run rate these days, appear to be four or five a quarter, but I'd say there is a larger proportion of them that look like they are Q4 in a pipeline versus Q3."

(c)     At the same time, Defendants highlighted Hortonworks' growth and the reasons behind it.  Davidson stated, "So what's behind the revenue growth metrics?  We added 119 new unique support subscription customer logos up 125% year-over-year. … [O]perationally, a larger proportion of total revenue is comprised of subscription thus driving better gross margins."  Bearden similarly stated, "In Q2, we added 119 new unique customer logos, making it 224 in the

first half of 2015 and bringing our total subscription customer base to over 550, up over 180% year-over-year."  Bearden also touted the partnership with Microsoft, which he called "our first major commercial and technical partner," stating, "HDInsight sustained is the standard in this market and thus we're pleased to report we renewed our three-year deal with Microsoft and look forward to expanding our customer value add together."

(d)    During analyst questioning, Defendant Davidson stated:

Q:    "[C]an you please address the lack of margin liquid[ity] regard[ing] this quarter.  We saw a significant revenue upside but EBITDA was in line.  What are the additional areas that you're spending on and how should we think about the top line kind of falling down to EBITDA level.

Davidson:    So when we're looking at frankly at the growth rates that we're seeing right now. ***We've accelerated some of the investments that we had from the back half of the year into the earlier part of the year***. And so I don't think if there anything specifically that we're doing now that are really different some of the timing we're pulling some of those investments forward. ***So about 85% of our cost structure is headcount driven*** and so in each of these areas there is different requirement. So an example in the engineering side we talked a lot about 2.3 inclusion of Spark and what that means to our customers. We've also talked about the relationship with EMC and the engineering that we've got with this customers and one of the differentiating points that we have as a company as we build reference architectures with a lot of our partners and go to market strategies with some of them. And a lot of that requires engineering work to not only work on the HDP platform but the HDP platform has to work with multiple of data basis and other tiers in the infrastructure. ***So that requires a lot of engineering resources to do that so we've accelerated some of that work. We've also accelerated some of the work that we've done on our roadmap*** [indiscernible] ***development arrangements with some of our customers and some of that have some heavier spend up front***. And then in my organization in the sort of general G&A organization there are things about building out infrastructure and dealing with the velocity that we're seeing in deals. So subscription that have 178% requires sort of back end system to be able to push out through legal expertise to negotiate deals and so on so forth. So we've talked about sort of getting towards higher EBITDA numbers exiting '16 and '17 and we've been pretty consistent with that. ***The margin have sort of gone directionally the way that we've said and we're trying to drive the right investment earlier*** in terms of respect. So ***I don't think we'll see huge amount of incremental beyond what we've talked about historically***.

50.     Unbeknownst to investors, Defendants' statements on August 5-6, 2015 in the 8/5/2015 Press Release, the 8/5/2015 8-K, and the Q2 2015 Earnings Call quoted above were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by August 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership and unplanned investments like the Pivotal partnership, were already necessitating a huge personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016. These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering.  The omitted facts would be

seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.  To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

51.   These statements had their intended effect, driving up Hortonworks' stock price during August 5-6, 2015.  After opening at $22.49 on August 5, 2015, it reached an intra-day high of $24.62 and closed at $24.15.  On August 6, 2015, it opened at $27.09, reached an intra-day high of $28.91, and closed at $27.65.

52.   On August 13, 2015, Hortonworks filed a Form 10-Q with the SEC, which was signed by Defendant Davidson, setting forth its Q2 2015 financial and operating results (the "Q2 2015 10-Q").  The Q2 2015 10-Q contained false and misleading statements, as follows:

(a)   It stated, "Our largest source of operating cash inflows is from sales of our support subscriptions and professional services" and "[o]ur primary uses of cash from operating activities are for personnel costs."

(b)   It listed its cash and cash equivalents as of June 30, 2015 as $30.769 million (as compared to $129.084 million as of December 31, 2014), while stating, "Our cash equivalents are comprised primarily of money market funds…."

(c)   It also listed "total support subscriptions and professional services revenue" of $30.685 million for the three months ended June 30, 2015 (as compared to $12.087 million for the same period in 2014) and of $53.458 million for the six months ended June 30, 2015 (as compared to $20.624 million for the same period in 2014), offset by "total cost of revenue" of $13.214 million for the three months ended June 30, 2015 (as compared to $6.565 million for the

same period in 2014) and of $24.674 million for the six months ended June 30, 2015 (as compared to $12.465 million for the same period in 2014), leading to "gross profit" of $17.471 million for the three months ended June 30, 2015 (as compared to $5.522 million for the same period in 2014) and of $28.784 million for the six months ended June 30, 2015 (as compared to $8.159 million for the same period in 2014).

(d)     It also stated:

To date, we have financed our operations primarily through private placements of preferred stock, our initial public offering and the concurrent private placement of our common stock, and cash flow from operations. ***We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements <u>for the next 12 months</u>***.

53.     The Q2 2015 10-Q contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934 ("Exchange Act") as adopted pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Bearden and Defendant Davidson.  These Sox certifications stated, *inter alia*:

1.     I have reviewed this Quarterly Report on Form 10-Q of Hortonworks, Inc.;

2.     ***<u>Based on my knowledge</u>, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***; …

54.     Unbeknownst to investors, Defendants' above-quoted statements in the Q2 2015 10-Q, including those in the SOX certifications, were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by August 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership and

unplanned investments like the Pivotal partnership, were already necessitating a huge personnel expansion and causing significant difficulties in managing Hortonworks' cash position, which was about to be compounded by the Onyara acquisition; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees being brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.  These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering.  The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.  Defendants had no credible basis for their stated belief in the Q2 2015 10-Q that Hortonworks' cash and cash equivalents, together with its cash from support subscription and professional services sales to customers would be sufficient to

meet working capital and capital expenditure needs for the **next 12 months**, when in actuality, they were insufficient to meet those needs for **even six months**.  To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

55.     These statements had their intended effect, maintaining the inflation in Hortonworks' stock price.  After reaching an intra-day trading high of $27.16, Hortonworks' stock closed at $26.70 on August 13, 2015.

56.     At this point, analysts continued to carefully watch Hortonworks's cash position, in light of its ongoing growth, seeking guidance and reassurance that it could continue generating the cash necessary to sustain it.  For instance, on November 2, 2015, an RBC Capital Markets analyst report stated, "We expect the quarter to again be driven by strong new customer signing as well as expansion from their growing base.  Further, given their cash balance, we'd like to see the loses [sic] decline."

57.     On November 4, 2015, Hortonworks issued a press release (the "11/4/2015 Press Release"), which it filed as an attachment to a Form 8-K signed by Defendant Davidson and filed with the SEC the same day (the "11/4/2015 8-K").  It stated that Hortonworks had cash and cash equivalents as of September 30, 2015 of $25.09 million (as compared to $129.084 million as of December 31, 2014).  It also quoted Defendant Bearden as touting Hortonworks' growth in customers and subscriptions:

> We are pleased with our third quarter performance which was highlighted by support subscription revenue growth of 168% year-over-year and solid customer momentum with the addition of 152 new support subscription logos.  As leading enterprise organizations continue to deploy the Hortonworks Data Platform in production at scale, as evidenced by our 156% dollar-based net expansion rate

over the trailing four quarters, we are excited to serve as their trusted IT partner during this transformational period in the data management industry.

58.     On November 4, 2015, Hortonworks held its Q3 2015 earnings teleconference, on which Defendants Bearden and Davidson spoke (the "Q3 2015 Earnings Call").   On it, Defendants Bearden and, made materially false and misleading statements, including:

(a)     Defendant Davidson touted Hortonworks' revenues, including its support subscription revenues, its growth, and its cash on hand, stating:

> Third quarter billings were $43.8 million reflecting a 104% growth from Q3, 2014. Support subscription billings were up 129% year-over-year and represented 79% of total billings. Q3 total revenue was $33.1 million, up 159% year-over-year, support subscription revenue was $21.8 million, up 168% representing 66% of total revenue.
>
> So what's behind the revenue growth metrics?  We had eight deals over $1 million; we added 152 new unique support subscription customer logos, that's up 311% year-over-year.  And this exemplifies the land aspect of our strategy. … With 152 new unique customer logos, a portion of which has included new customers that we drove through channel partners, this makes it 376 new logos year-to-date and brings our total subscription base to 700.  This is up 200% year-over-year and recall that we added 99 logos in Q4, 105 in Q1, and 119 in Q2.
>
> * * *
>
> We ended the quarter with $116 million in total cash and investments. Total deferred revenue increased $42 million year-over-year to $90 million as of September 30. Approximately 87% of total deferred balance was comprised of support subscription and 85% of that was short term in duration.

(b)     Defendant Davidson discussed Hortonworks' growing employee base, its ongoing investment in additional sales and marketing personnel, the effects of "headcount from acquisitions" and the teams needed to ramp up work on Onyara offerings and to continue development work with major partners like Microsoft, while omitting to state that another offering was necessary to fund it all:

> In terms of non-GAAP operating expenses, we continue to invest and support the scale and future growth. We exited September with approximately 800 employees. At $30.4 million, sales and marketing expenses continues to be the

largest area of investment today. It is up over 60% over the prior year. This does compare favorably though it is subscription revenue which grew by 168% year-over-year. We continue to make targeted investment in sales and marketing including sales reps, SEs and marketing programs spend.

Research and development expenses increased 27% year-over-year to $12.1 million, primarily driven by headcount from acquisitions and build out of teams to support the recently created offerings like HDF from Onyara. And openSOC as well as the incremental features on HDP version 2.3 and continued development with partners like Microsoft and EMC Pivotal.

(c)     Defendant Bearden, asked about Hortonworks' rising staffing needs, pointed to its growing leverage and revenue, not to the need to raise more capital through an offering:

Q:  I think you gave the headcount number at about 800. Obviously, it's good growth year-over-year. I know there was some acquisition in there. But when you think about just sort of feeding the beast of sales and marketing here, because you do keep acquiring more new customers but also the deal sizes to existing customers are getting bigger, I mean how should we think about how you are ramping that sales force? And then also kind of relative to some of those partnerships in the channel, et cetera that you also have?

Bearden:  Yes. So it is about actually overall enabling the model. There will be always organic adding of direct field reps, in addition to that though we are very focused on the ecosystem and creating [pull] [ph] markets with our partners. ***And we are actually seeing that part of our business begin to gain real traction and seeing actual pull through revenue, that's meaningful, come through***. *And that gives us leverage of course*. ***The other thing that we are able to do now is also get incremental leverage from our existing sales organization with the new product*** that we just obviously outlined on this call and ***which is the Hortonworks DataFlow platform. And so now we can as a multi product company get more leverage per rep with incremental product. And so we are going to see the benefit of that going forward as well***.

(d)     Defendants Bearden and Davidson expressly referenced the Onyara acquisition, as part of a larger commentary as to Hortonworks' conservation of cash.  Specifically, Defendant Bearden described the Onyara acquisition as follows:

And while HDP is the backbone of Hortonworks' core business today, we are extending our open source leadership position beyond core Hadoop to address the broader big data market with the acquisition of Onyara, which closed on August 31.

Onyara was a small company that spun out of the NSA in 2014 to commercialize Apache NiFi. Now already on its fourth version NiFi was created by this team over the past eight years and is used by NSA in some of the most rigorous conditions. And we are pleased that the main committers of Apache NiFi are now Hortonworkers and bring this domain expertise to the company. So as a result of our acquisition of Onyara we recently introduced a new platform called Hortonworks DataFlow or HDF which is powered by Apache NiFi and primarily addresses the needs of data-in-motion which is real time streaming from any data source. HDF is a cornerstone technology for the Internet-of-Anything use cases that need to derive real time insights from data generated mostly outside the traditional data center. In fact, several third party research firms estimate that up to 85% of data growth by 2020 will be generated from Internet-of-Anything sources the bulk of which originate outside the traditional data center. So by combing both data-at-rest on HDP and data-in-motion via the Hortonworks DataFlow platform we now capture all facets of the data continuum and significantly increase our addressable market.

Defendant Davidson also said, "*[O]ur 2015 margin profile has remained intact*. … Of note, *we remained consistent while absorbing the SequenceIQ transaction* that brought us the value team and technology to support the hybrid cloud, *as well as the Onyara acquisition* that supports data-in-motion and security analytics." Later, Davidson, in response to analyst questions, stated that there was "nothing really out of the ordinary" regarding Hortonworks' "conservation of cash," notwithstanding the Onyara acquisition, stating in pertinent part:

Q:  But the second part of my question is -- and you mentioned it -- narrowing the EBITDA burn. Not as it relates to 2016 but I guess you saw the first improvement in adjusted EBITDA in your history as you said. And yet cash burn was a little bit higher than we were expecting. So I was just wondering if you could touch on the cash burn as it relates to EBITDA. And if your same goals for next year in terms of narrowing the EBITDA burn also apply to cash flow. And if you could just comment for cash flow on what happened in the quarter that would be great, too.

Davidson:  Yes, they do. I mean to me they are somewhat synonymous. I think the generally speaking the adjusted EBITDA and the cash burn are closer. But *in terms of the way that we manage the business, the conservation of cash and/or EBITDA*, adjusted EBITDA *sort of synonymous*. So my comments are consistent with both of those points. *In the particular quarter, there was a little bit of lengthening in the DSO over the prior quarter <u>but nothing really out of the ordinary</u>*, DSO I think was about 80 days. And so there were so no -- we have that plus we had the expenditure for the extra headcount with Onyara and things like

that it impacted cash but that the point is that next year where our cash burn is an important element just like adjusted EBITDA. We think of them in the same way.

59.     Unbeknownst to investors, Defendants' above-quoted statements on November 4, 2015 in the 11/4/2015 Press Release, the 11/4/2015 8-K, and the Q3 2015 Earnings Call were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.   These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions, customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only

cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering.  The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.  To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

60.     These statements had their intended effect, maintaining inflation in Hortonworks' stock price.  After reaching an intra-day trading high of $20.78, Hortonworks' stock closed at $20.36 on November 4, 2015.

61.     At this point, analysts continued to believe, based on the Defendants' statements, that Hortonworks could generate sufficient cash to fuel its growth without doing a secondary offering.  For instance, an RBC Capital Markets report issued November 5, 2015, stated, "Thoughts on cash:  We believe management should continue to be aggressive on investments, but is mindful about hitting adjusted EBITDA break-even in the 1H/17 or sooner.  That said, we believe there are a number of ways to build the war chest other than a secondary offering, such as a strategic investment or convert for example."

62.     On November 11, 2015, Hortonworks attended the 2015 RBC Capital Markets Technology, Internet, Media, and Telecommunications Conference (the "11/11/2015 RBC Conference"), at which Defendant Davidson and Hortonworks VP of Corporate Development Brian Marshall attended investor meetings hosted by RBC, during which additional false and

misleading statements were made by Defendants and then summarized by RBC in an analyst report issued later that day.  Specifically:

(a)      When asked to address investor concerns about the volatility of Hortonworks' stock and to identify the reasons behind it, Defendant Davidson stated:

> Well, I think there's three things, Matt. I think people are concerned a little bit about perceived conservative guidance. They take it at the midpoint, at 66% growth year-over-year, and assume that that's both support subscription and professional services. And that is not what we indicated on the call. If you parse the information, we are still talking about subscription billings growth year-over-year in Q4 of 100%.
>
> ***Number two would be cash balances. We are at $116 million of cash on the balance sheet***. And ***I think the third concern is basically burn***. And so ***if you think about adjusted EBITDA*** as -- what we have said in the past since the IPO is that ***that should be viewed as a proxy for operating cash flow***.  ***Well, this quarter it was a little bit different. We beat expectations and our guidance for adjusted EBITDA; but on the operating cash flow side, it was about negative $30 million, and the adjusted EBITDA was around negative $20 million. So that incremental difference -- people just assume that, oh, these guys are burning $30 million a quarter -- when, actually, that is not really the case, and that is not what we are indicating on a go-forward basis***.
>
> There are some accounting nuances that we can talk about, how cash collections offsets things. But ***over time, that will converge, and true operating cash flow will mimic adjusted EBITDA***.

(b)      When asked about the cash burn rate, Defendant Davidson expressly disclaimed any need by Hortonworks to raise more capital, while making absolutely no mention whatsoever that a secondary offering was under consideration, in this exchange:

> Q:      I want to -- maybe just quickly on the cash balance side -- we spoke after the call. This is -- you know, there is a cash burn in place here. And I think you said you have $116 million. But there are certainly some options for you guys on the cash front. And I think the way you look at it, correct me if I'm wrong, is you would like to get even potentially more aggressive. And that's by raising potentially some additional funds in a variety of different manners. You're not looking it at as more of a defense -- of, like, oh, we are going to run out of cash. But if there is a strategic acquisition here or there, that's -- talk about cash and your philosophies on that.

Davidson:  Yes, so more cash, better, right? That's good philosophy to have. And so I think one of the things we talk about was when we went public with HDP as the core functionality in products, that we said based on where we are driving, we will be sort of exiting -- or we'll be sort of breakeven, if you will, early 2017. **We view that we would have a fully funded model through 2016**.

And since that time, we have done a couple of acquisitions. And now we have also done the Onyara acquisition, which is -- it was a stock deal. But we look at this business now, and you may remember that we guided when we went public at 65% growth or 70% growth at the midpoint. Well, based on Q3 we are north of 100% already. So we have seen opportunities in the market to go faster. So we've done that. In Q3, using adjusted EBITDA number, we actually dialed in an adjusted EBITDA number that was actually better than what we talked about. ***So from an adjusted EBITDA perspective, we actually reduced the burn and absorbed these deals. So we are clearly cognizant of managing cash***.

When we look at the opportunity set, though, whether it is the $50 billion from HDP that we talked about or the HDF data points around IoT and some of the other numbers, they are big, big markets. And they are open for sort of land grabs -- and not at any cost, but if we have the opportunity to continue to grow anywhere near the rate that we are growing at 100%-plus, we want to go attack that market. And so we are looking at this re-architecture of the data layer. And typically you will see re-architectures happen, if you are lucky, every 15 years, and this is one of them.

***So the idea would be to try to sort of drive faster, if we could, HDP fully funded as we talked about. If we want to continue to accelerate, we may avail ourselves of a couple different choices on the cash front. But it is an option as opposed to a need. I think that's an important thing to take away***.

(c)    RBC's report issued later that day summarized these remarks (quotes conveying the RBC report's text): (a) that "***Cash on the balance sheet of $116M, but management does not view this as an issue for operations***.  It may look to expand its cash balance to be prepared for investment opportunities such as further M&A.  EBITDA is expected to break-even in early 2017.  We think the opportunity for a strategic investment or convert could be a possibility." and (b) that "Cash burn rate higher than expected.  Adjusted EBITDA should generally be a proxy for cash flow, this was not the case in the third quarter where EBITDA beat estimates but cash flow did not improve at a similar magnitude.  ***Management pointed out that this should be seen***

*as an exception and not the rule and continues to feel that over the long-run EBITDA will be a good proxy for cash flow*."

63.     Unbeknownst to investors, Defendants' above-quoted statements on November 11, 2015 during the 11/11/2015 RBC Conference were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.   These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions, customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital

expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering. The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.   To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

64.     These statements had their intended effect, maintaining inflation in Hortonworks' stock price.  After reaching an intra-day trading high of $17.95, Hortonworks' stock closed at $17.49 on November 11, 2015.

65.     On November 12, 2015, Hortonworks filed a Form 10-Q with the SEC, which was signed by Defendant Davidson, setting forth its Q3 2015 financial and operating results (the "Q3 2015 10-Q").  The Q3 2015 10-Q contained false and misleading statements, as follows:

(a)     It stated, "Our largest source of operating cash inflows is from sales of our support subscriptions and professional services" and "[o]ur primary uses of cash from operating activities are for personnel costs."

(b)     It listed its cash and cash equivalents as of September 30, 2015 as $25.09 million (as compared to $30.769 million as of June 30, 2015 and $129.084 million as of December 31, 2014), while stating, "Our cash equivalents are comprised primarily of money market funds…."

(c)     It also listed "total support subscriptions and professional services revenue" of $33.051 million for the three months ended September 30, 2015 (as compared to $12.764 million for the same period in 2014 or $30.685 million for the three months ended June 30, 2015) and of

$86.509 million for the nine months ended September 30, 2015 (as compared to $33.388 million for the same period in 2014), offset by "total cost of revenue" of $14.8 million for the three months ended September 30, 2015 (as compared to $9.535 million for the same period in 2014 or $13.214 million for the three months ended June 30, 2015) and of $39.474 million for the nine months ended September 30, 2015 (as compared to $22.0 million for the same period in 2014), leading to "gross profit" of $18.251 million for the three months ended September 30, 2015 (as compared to $3.229 million for the same period in 2014 or $17.471 million for the three months ended June 20, 2015) and of $47.035 million for the nine months ended September 30, 2015 (as compared to $11.388 million for the same period in 2014).

(d)     Just like the Q2 2015 10-Q a quarter before, the Q3 2015 also stated:

To date, we have financed our operations primarily through private placements of preferred stock, our initial public offering and the concurrent private placement of our common stock, and cash flow from operations. *We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements <u>for the next 12 months</u>*.

66.     The Q3 2015 10-Q contained SOX certifications by Defendant Bearden and Defendant Davidson, which stated, *inter alia*:

1.     I have reviewed this Quarterly Report on Form 10-Q of Hortonworks, Inc.;

2.     ***<u>Based on my knowledge</u>, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***; …

67.     Unbeknownst to investors, Defendants' above-quoted statements in the Q3 2015 10-Q, including those in the SOX certifications, were materially false and misleading due to

omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.   These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions, customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering. The omitted facts would be seen by a reasonable investor as materially altering the total mix of

information available about Hortonworks. Defendants had no credible basis for their stated belief in the Q3 2015 10-Q that Hortonworks' cash and cash equivalents, together with its cash from support subscription and professional services sales to customers would be sufficient to meet working capital and capital expenditure needs for the ***next 12 months***, when in actuality, they were insufficient to meet those needs for ***even two months***, such that Defendants were planning a secondary offering that would be announced and fully papered in a Form S-3 filed with the SEC just ***two months*** later. To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

68. These statements had their intended effect, maintaining the inflation in Hortonworks' stock price. After reaching an intra-day trading high of $17.60, Hortonworks' stock closed at $16.12 on November 12, 2015.

69. On November 16, 2015, Hortonworks attended the UBS Global Technology Conference (the "11/16/2015 UBS Conference"), at which Defendant Davidson and Hortonworks VP of Corporate Development Marshall attended investor meetings hosted by UBS, during which additional false and misleading statements were made by Defendants. Specifically, Defendant Davidson was asked about how Hortonworks would sustain its momentum, given its working capital management constraints and cash balances, prompting Davidson touted Hortonworks' ***enhanced*** cash position and once again failed to disclose any plans for a secondary offering, in this exchange:

> Q: [S]ince having gone public the fundamentals and the metrics to gauge the health of the business have been moving up and to the right, accelerating the number of new customers you are bringing on board, increasing the level at which you are penetrating your existing customers. The question is, I think investors

34

generally appreciate the opportunity, but how do you think about sustaining the current trajectory and the current momentum in the context of your investment philosophy and how you think about your working capital management constraints or your cash balances?

Davidson:      Yes, so a couple things; I mean I think it's helpful to start and sort of frame the market here, to make sure everybody is on the same page. When we went public back in Q4 last year, one of the oft-cited reports in this market space came out of IDC. And IDC said that the market for Hadoop by 2020 is going to be a $50 billion market. Within the context of that, 20% of that is going to be based on software, the rest being hardware and services.

So, there is three companies that are really focused in this market, and we are the only public Company that has done it. And so philosophically, we have attacked the market from a 100% open source approach, whereby all of the code that we develop goes into the Apache Software Foundation. It is free. You can download it. But we sell a support subscription similar to what Red Hat does, you may know, in the Linux world.  And so, that is sort of the starting point.

And so within the context of that, what we've seen is in the last couple of quarters, we've accelerated on both our revenue basis and kind a customer count, new logo basis. And so that begs the question, which is with a large market, with a growing market and being one of only three providers, how fast do you want to sort of go attack that. ***We have more cash now than we did when we went public***. ***And so as we enter 2016, the question is do we want to pour more fuel on the fire and continue the growth rate, or do we want to moderate to spend and try to get cash breakeven quicker than what we have talked about***?

The guidelines since we went public was early 2017. Q3 represented the first quarter where the year-over-year burn was lower than it was Q3 over Q3, and ***so we are on pace, if not slightly ahead of pace, with where we've been on guidance for the burn***.  So no change there, and ***so when we think about 2016, as we model that out, we will decide sort of where we go and sort of how fast and any capital structure decisions***.

Marshall:      And that also includes the integration of two acquisitions that we've done, SequenceIQ earlier in the year, and we also just did Onyara for our new HDF Internet of Things, as well as data provenance platform.

70.      Unbeknownst to investors, Defendants' above-quoted statements made during the 11/16/2015 UBS Conference were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth,

including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.   These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions, customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering. The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.   To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and

the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

71.    These statements had their intended effect, maintaining the inflation in Hortonworks' stock price.  After reaching an intra-day trading high of $16.44, Hortonworks' stock closed at $16.18 on November 16, 2015.

72.    On December 1, 2015, Hortonworks attended the Credit Suisse Technology, Media, and Telecom Conference (the "12/1/2015 Credit Suisse Conference"), at which Defendant Bearden and Hortonworks VP of Corporate Development Marshall attended investor meetings hosted by Credit Suisse, during which additional false and misleading statements were made by Defendants.  Specifically, Defendant Bearden highlighted that Hortonworks had $116 million in cash and *repeatedly* said "we're comfortable operating on that," in this exchange:

> Q:      You said the B word so I'm going to ask a question, burn. So cash burn because obviously I've been getting that question, you know, last night, this morning. You know, when you guys look at your sort of cash position, and you're obviously in this point of your lifecycle where you're growing fast, you're hiring people, big market opportunity you just talked about, and then big market opportunity hitting inflection point. You know, how do you sort of balance the need to invest, but also looking at your burn and at the, you know just the cash on the balance sheet? So kind of a question for both of you, like how do you think about that because -- yeah, I'll just leave it there.

> BEARDEN:   Well, *we have a model that today shows us getting the cash* (inaudible) *profitability in early 2017.  Even with the two acquisitions that we've done, we're very comfortable with that model*. In fact we're showing improved performance against that, that Brian just pointed out in Q3, quarter-over-quarter. *And with that we have roughly $116 million in cash*. *It gives us a fully funded model to that point of profitability when you do, you know, when you extrapolate your model*, we're somewhere under $50 million in cash. *We're comfortable operating on that*.

> Q:      That was the next question.

> BEARDEN:   Yeah.  *We're comfortable operating on that*. At some point we may choose to take an opportunistic view downstream into the markets, but we'll do that on an opportunistic basis when the time is right.

Q:     Got it. Okay, so, because that's the question, like I've given you this example before, you know plane taking off the aircraft carrier, you know you don't mind getting close to the water, just don't crash into it, you know. So there's enough air, so to speak, between you and the water you feel comfortable with? Okay.

BEARDEN:   *Very much so*. And we see the market continuing to expand, and you know *we're very comfortable with our positioning and where we are from an execution against our model*.

73.     Unbeknownst to investors, Defendants' above-quoted statements made during the 12/1/2015 Credit Suisse Conference were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.   These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions,

customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering. The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks.  Defendants had no credible basis for their stated comfort level operating on Hortonworks' existing cash position, when in actuality, they were planning a secondary offering that would be announced and fully papered in a Form S-3 filed with the SEC in *just six weeks*.  To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

74.    These statements had their intended effect, maintaining the inflation in Hortonworks' stock price.  After reaching an intra-day trading high of $17.39, Hortonworks' stock closed at $17.04 on December 1, 2015.

75.    On December 9, 2015, Hortonworks attended the Barclays Technology Conference (the "12/9/2015 Barclays Conference"), at which Defendant Davidson and Hortonworks VP of Corporate Development Marshall attended investor meetings hosted by Barclays, during which additional false and misleading statements were made by Defendants. Specifically, Defendant Davidson was asked about Hortonworks' cash burn rate and responded by, among other things, highlighting Hortonworks was already "close" to a cash breakeven, such

that any capital raises would be discretionary and did not have to be an equity offering, in this exchange:

> Q:      [O]ne question that I get from investors all the time, I know it's the tough part of your day, cash. That's the one -- a lot of people like this story that put the one concern that's out there is like okay, if I look at the burn rate by at some point in 2016, 2017 is getting close. Can you talk a little bit about that?
>
> Davidson:      Yes. I mean I think that we've been pretty consistent on the cash position and the adjusted EBITDA. ***We said we'd be at breakeven adjusted EBITDA in first half of 2017***. I think ***depending upon the way your models now work, we end up getting "close"*** as you say, and we're aware of that. We want to continue to drive the growth rate as we are and so ***we'll avail ourselves as markets or provide the opportunity to maybe raise cash in one form or another***. ***<u>And there is a lots of ways to do that, right. It doesn't have to be a share – straight up equity offering</u>. There is a couple different ways to do that***. And one thing that I'll sort of leave for the last answer on this is that there are a lot of companies in addition to those of us that want to see Hadoop in the market succeed, every company out there has a big data strategy. Many of those that have a big data strategy, how Hadoop is part of that big data strategy and does that have Hadoop as part of it, have either made a choice to support our distribution of Hadoop or in some cases, a dual distribution. And so there is a lot of companies out there that want us to succeed. ***So when you think about access to capital, it's available. It's a timing thing how we decide if we want to do that***.

76.      Unbeknownst to investors, Defendants' above-quoted statements made during the 12/9/2015 Barclays Conference were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to Defendants, including as described by the CWs, that by November 2015, *inter alia*: (a) Hortonworks' rapid growth, including deals with major clients such as the renewed Microsoft partnership, unplanned investments like the Pivotal partnership, and major acquisitions like the Onyara deal had already necessitated a huge, ongoing personnel expansion and causing significant difficulties in managing Hortonworks' cash position; (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely independent contractors to paid employees, on

top of the Onyara employees brought on board upon the acquisition's closing in August 2015; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016. These omitted facts and circumstances rendered Defendants' statements materially false and misleading by, *inter alia*, presenting Hortonworks' corporate acquisitions, customer expansion, subscription growth, and increasing revenues and other operating and financial metrics as purely positive, without disclosing the downside impacts of that growth on Hortonworks' strained cash position, its inability to continue funding working capital and capital expenditure needs through only cash/cash equivalents and cash generated from sales of support subscriptions and professional services to customers, Hortonworks' need for a dilutive secondary equity offering to supplement its cash position, and Defendants' decision to pursue such offering. The omitted facts would be seen by a reasonable investor as materially altering the total mix of information available about Hortonworks. To the extent that any of Defendants' quoted statements conveyed any opinion, they also conveyed facts about how the speaker formed it and the basis for holding the view expressed, both of which were in actuality contrary to the real, undisclosed facts, thus rendering the statements misleading.

77. These statements had their intended effect, maintaining the inflation in Hortonworks' stock price. After reaching an intra-day trading high of $20.00, Hortonworks' stock closed at $19.74 on December 9, 2015.

78.     Throughout the Class Period, Hortonworks' stock had traded between a Class Period low of $15.75 and a Class Period high of $28.91, due to the inflation caused by Defendants' misstatements and omissions as alleged herein.

79.     On January 15, 2016, Hortonworks' stock closed at $16.57, after reaching an intra-day high of $16.73.

### The Truth Begins To Emerge

80.     In direct contradiction to Defendants' Class Period statements outlined above, after the markets closed on Friday, January 15, 2016, Hortonworks shocked investors by announcing it was seeking to raise ***$100 million in a secondary offering*** – ***<u>barely a year after its initial public offering in December 2014</u>***.  Specifically:

(a)     Hortonworks issued an after-hours press release (the "1/15/2016 Press Release") disclosing it had retained Goldman Sachs & Co., Credit Suisse Securities (USA) LLC, and RBC Capital Markets LLC to serve as joint book-running managers for the offering, as well as Pacific Crest Securities, a division of KeyBanc Capital Markets, Inc., Wells Fargo Securities, LLC, and PJT Partners LP to act as co-managers.

(b)     Hortonworks also filed a Form S-3 (the "1/15/2016 S-3"), after the close of the markets, regarding the $100 million offering.  Counter to Defendants' Class Period statements, it stated that the offering was to be used for "working capital" and "general corporate purposes," like "funding our growth strategies," "expansion of our sales organization," and "further development and enhancement of our…data platforms," while ***admitting*** the reason for the offering was ***not*** any then-existing acquisitions in the making.  Specifically, the Form S-3 stated:

> The principal purposes of this offering are to raise additional capital to increase our financial flexibility. ***We intend to use the net proceeds that we receive from this offering for working capital or other general corporate purposes***, ***including funding our growth strategies*** discussed in this prospectus. ***These uses include***

***the expansion of our sales organization, both directly and indirectly through our reseller and OEM partners, international expansion in North America, Western Europe and other geographies, further development and enhancement of our enterprise-scale Connected Data Platforms (HDP and HDF) and integration with the Hadoop ecosystem and general and administrative matters***, although we do not currently have any specific or preliminary plans with respect to the use of proceeds for such purposes.

We may also use a portion of the net proceeds that we receive to acquire or invest in complementary businesses, products, services, technologies or other assets. We have not entered into any agreements or commitments with respect to any acquisitions or investments involving the use of the net proceeds of this offering at this time.

We cannot specify with certainty the particular uses of the net proceeds that we will receive from this offering. Accordingly, we will have broad discretion in using these proceeds.

81.     Reactions were swift and harsh.  *Investors Business Daily*'s coverage opened by saying, "If you want to raise suspicion, try announcing that you need to raise $100 million after the worst two weeks of a new year in stock market history."  A Needham & Co. analyst said, "[D]espite the worst two week start for the markets ever, the company also announced a follow-on offering.  Clearly, some type of capital raise was anticipated…, but there was no sense of urgency on the part of management in any public commentary.  We believe it will be incumbent on HDP during its roadshow to show why this offering, announced in this way, at this time, should not be interpreted as evidence of serious difficulty."  An analyst at DA Davidson called the timing of the offering "surprising" given current market conditions and Hortonworks' previous commentary of reaching cash flow breakeven in early 2017.

82.     On this news, Hortonworks' stock cratered the next trading day, Tuesday, January 19, 2016 (since the markets were closed on Monday, January 18, 2016, for Martin Luther King, Jr. Day), falling $6.13 per share, ***nearly 37%***, on exceptionally high volume, to close at $10.44.

83.     Hortonworks' stock has ***never recovered*** to its Class Period prices.

84.     As a result of Defendants' materially false and misleading statements and omissions, Hortonworks securities traded at inflated prices during the Class Period.  However, after Defendants' fraud was revealed, Hortonworks' stock suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiffs and other Class members.

**CLASS ACTION ALLEGATIONS**

85.     This is a federal securities class action on behalf of a class consisting of all persons who purchased or otherwise acquired the common stock of Hortonworks during the Class Period of August 5, 2015 through January 15, 2016, both dates inclusive, seeking to recover damages caused by Defendants' violations of the federal securities laws.  Excluded from this Class are Defendant Hortonworks and its affiliates, directors and officers of Defendant Hortonworks and their family members, and the Individual Defendants and their family members.

86.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hortonworks' stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds if not thousands of members in the proposed Class. Millions of Hortonworks shares were traded publicly during the Class Period on the NASDAQ. As of August 6, 2015, Hortonworks had 44,025,832 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Hortonworks or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

87.     Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

88.     Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

89.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period, as alleged herein, misrepresented and/or omitted material facts about the business, operations, management, and prospects of Hortonworks, including, *inter alia*, its purported ability to fund operations from existing cash and cash equivalents plus cash generated from sales of support subscriptions and professional services and its purported lack of a need for any equity offering;

- whether Defendants acted knowingly or recklessly in issuing false and misleading public statements as alleged herein;

- whether the prices of Hortonworks stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

90.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FRAUD ON THE MARKET PRESUMPTION

91.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, *inter alia*:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Hortonworks securities traded in an efficient market at all relevant times;

- Hortonworks' shares were liquid and traded with moderate to heavy volume at all relevant times;

- Hortonworks' stock traded on the NASDAQ during the Class Period and was covered by multiple analysts at all relevant times;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Hortonworks' securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Hortonworks securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

92.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

93.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted substantial material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**NO SAFE HARBOR**

94.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded herein, which were not properly identified as forward-looking statements when made.

95.     To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

96.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are nonetheless liable for making such statements because, at the time each statement was made, they knew the statements were materially false and/or misleading.

**SCIENTER**

97.     To the extent it is required to be plead for certain of the claims alleged herein, Defendants' scienter is readily apparent.

98.     It is clear that, at all relevant times, Defendants acted knowingly and intentionally.  As alleged in greater detail *supra*, Defendants made the materially false and misleading statement and omissions constituting the fraud at issue with full knowledge of their falsity due to contrary facts, evidenced by numerous CWs and documentary evidence, which were undisclosed to investors.  Defendants at all relevant times knew the true circumstances at Hortonworks, including as described by the CWs herein, which included: the extreme escalation of Hortonworks' operating expenses and the difficulties controlling them; the increased strain on Hortonworks created by its expansive growth, including the Microsoft renewal, the unplanned investment in Pivotal, and the Onyara acquisition and the unplanned investment in NiFi buildout, including in particular the greatly increased staffing needs; the significant impacts of the "latent

revenue" problems at Hortonworks, including those caused by Pivotal's service contract approach; and the strains and escalating costs caused by Hortonworks' transition from a staffing model based largely on non-employee independent contractors to one based on paid employees; and Hortonworks' decision to pursue a secondary equity offering.  Defendants' knowledge is evidenced by, among other things:

(a)     CW1 stated that Defendant Davidson was directly and intimately involved in managing Hortonworks' cash flow, which he regularly communicated to senior sales staff through the monthly "All Hands Calls," during which Hortonworks' expenses and strategy were frequently discussed and managing expenses was always a top concern.

(b)     As stated by CW1, all of Hortonworks' business transactions were managed using Salesforce.com, a cloud-based accounting system, into which, for example, CW1 recorded sales and business-related expenses.   This system gave Hortonworks' highest-level employees, including Defendants Davidson and Bearden, easy, electronic, real-time visibility into Hortonworks' cash balances and cash burn rate.

99.     Moreover, among other things, Hortonworks' Forms 10-Q filed during the Class Period unequivocally stated, "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for the next 12 months."   Those Forms 10-Q were SOX-certified by Defendants Bearden and Davidson, both of whom certified, *inter alia*:

1.     I have reviewed this Quarterly Report on Form 10-Q of Hortonworks, Inc.;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rule 13a-15(e) and 15d-15(e) for the registrant and have:

     (a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including in its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared.;

     (b)    Evaluated the effectiveness of the registrants' disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;

100.    The fraud alleged herein also implicates the core operations of Hortonworks. Its ability to continue to fund its expansive growth, in a highly competitive field in which it was the sole publicly-traded company, was one of its most critical issues heading into the Class Period, as evidenced by, among other things, the frequency with which Defendants were asked by analysts about Hortonworks' cash position and cash burn rate. Moreover, the decision Defendants reached, which they first publicly announced on January 15, 2016, to engage in a secondary offering that would severely dilute existing shareholders, clearly implicated Hortonworks' core operations. In light of these facts, it is inconceivable that Defendants did not know the facts and circumstances of the fraud as alleged herein.

101.    Moreover, each of Defendant Bearden's and Defendant Davidson's misstatements alleged herein were made by them as CEO/Chairman and CFO, respectively, of Hortonworks. In those roles, he had a legal duty to monitor information indicating that their statements were false, such that their failure to do so could only have been through their recklessness. Moreover, the information rendering their statements false and misleading is imputable to them, due to their titles, roles, and responsibilities at Hortonworks.

102.    Defendants were also under a clear duty to speak truthfully and, having chosen to speak, were obligated to speak the whole truth. Defendants made and/or caused to be made the

alleged false and misleading statements and omissions alleged herein and signed the SEC filings within which such misstatements and omissions appeared.  As they spoke, they reaffirmed the strength of Hortonworks' cash position and disclaimed any need for an equity offering, again and again, even as they must have been deep within the process of lining up underwriting for the secondary offering and overseeing preparation of the complex Form S-3 that was filed on January 15, 2016.  Thus, as discussed herein, Defendants violated such duties.

103.   In addition to the foregoing, Defendants have engaged in deliberate misconduct and illegality, which supports their inference of scienter.  In June 2016, a few months after this lawsuit was filed, CW3 said that Hortonworks HR staff called and warned CW3, who had left Hortonworks back in February 2016, not to speak to Plaintiffs' counsel or their investigator. CW3 said that other former employees, with whom CW3 remains in touch, received the same phone call.  CW3 said that Hortonworks HR staff threatened them with potential adverse actions, due to any confidentiality agreement they may have signed.  This blatant witness intimidation, seeking to conceal the true facts relevant to the allegations of securities fraud alleged herein, is powerful corroborating evidence of Defendants' scienter.

### LOSS CAUSATION / ECONOMIC LOSS

104.   The market for Hortonworks shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Hortonworks shares and operated as a fraud or deceit on Class Period purchasers of Hortonworks shares by misrepresenting the material facts detailed herein.  As detailed above, when Defendants' prior misrepresentations became known to the public, the price of Hortonworks shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of

Hortonworks shares during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

105.    During the Class Period, Defendants presented a false and misleading picture as to, *inter alia*, Hortonworks' operational and financial performance, including its cash position, cash burn rate, and expansive growth; Hortonworks' ability to continue to fund its expansive growth, in a highly competitive field in which it was the sole publicly-traded company, through its existing cash and cash equivalents plus cash generated from sales of support subscriptions and professional services to customers; and the lack of any need to raise cash via a secondary equity offering.  Defendants' false and misleading statements caused Hortonworks shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

106.    In response to the corrective disclosures made after the close of the markets on January 15, 2016, the price of Hortonworks shares plummeted on the next trading day, January 19, 2016, thereby removing inflation due to the alleged fraud, causing real economic loss to investors who had purchased Hortonworks shares during the Class Period.

107.    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Hortonworks shares negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic factors or company-specific facts unrelated to Defendants' fraudulent conduct.

108.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Hortonworks' share

price and the subsequent significant decline in the value of Hortonworks shares when their prior misrepresentations and other fraudulent conduct were revealed.

## COUNT I
### (Against All Defendants For Violations Of
### Exchange Act Section 10(b) And Rule 10b-5 Promulgated Thereunder)

109.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

111.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Hortonworks securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Hortonworks securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

112.    Pursuant to the above plan, scheme, conspiracy and course of conduct, Defendants participated directly or indirectly in the preparation and/or issuance of the press

releases, SEC filings, and other public statements as described above, including statements made to securities analysts and the media that were designed to influence the market for Hortonworks securities.   Such releases, filings, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the strength of Hortonworks' cash position, its ability and willingness to fund working capital needs based on holdings of cash and cash equivalents plus case derived from sales to customers, and its need or intention to pursue a secondary equity offering, as well as Hortonworks' financial condition, operations, and business prospects

113.   Information showing that Defendants acted knowingly or with reckless disregard for the truth was peculiarly within their knowledge and control.

114.   Defendants' actual knowledge of the materially false and misleading statements and material omissions made throughout the Class Period, by which they intended to deceive and did deceive Plaintiffs and the other members of the Class, cannot reasonably be disputed as they had knowledge of and access to the facts and circumstances concerning Hortonworks' cash position and the strains thereon, the impacts on Hortonworks of its partnerships and acquisitions, its personnel needs and the escalating costs thereof, and the need and intention to pursue a secondary equity offering.   Such knowledge would in any event be imputable to Defendants Bearden and Davidson due to their positions and oversight roles at Hortonworks and the implication of the core operations of Hortonworks.   As its CEO/Chairman and CFO, respectively, Defendant Bearden's and Defendant Davidson's knowledge is imputable to Defendant Hortonworks.

115.   In the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and

misleading nature of the statements made, although such facts were readily available to them, including, *inter alia*, through the materials used to prepare the substance of the regular "All Hands Calls," the business transactions database maintained using Salesforce.com, and the disclosure controls and procedures whose design Defendants Bearden and Davidson undertook or oversaw and whose effectiveness they certified. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, they knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

116. Defendants Bearden and Davidson are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, they were able to and did, directly or indirectly, control the content of the statements of Hortonworks as alleged herein. As officers and/or directors of a publicly-held company, they had a duty to disseminate timely, accurate, and truthful information with respect to Hortonworks' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the false misleading public statements as alleged herein, the market price of Hortonworks securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Hortonworks' business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Hortonworks securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

117. During the Class Period, Hortonworks securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Hortonworks securities at prices artificially inflated by his wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Hortonworks securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Hortonworks securities declined precipitously upon public disclosure revealed the truth as alleged herein, to the injury of Plaintiffs and Class members.

118.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

119.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of Hortonworks' securities during the Class Period, upon the corrective events outlined herein that revealed that Defendants had been disseminating material misrepresentations and omissions to the investing public.

**COUNT II**
**(Violations Of Section 20(a) Of The Exchange Act**
**Against Defendants Bearden and Davidson)**

120.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

121.   During the Class Period, Defendants Bearden and Davidson participated in the operation and management of Hortonworks, and conducted and participated, directly and

indirectly, in the conduct of Hortonworks' business affairs.  Due, *inter alia*, to their positions as CEO/Chairman and CFO, respectively, and their related oversight roles, they knew the adverse non-public information about Hortonworks' business, operations, finances, and future prospects, including without limitation the material information alleged to have been misstated and omitted in their public statements as discussed herein regarding, *inter alia*, Hortonworks' cash position, burn rate, and strategy, as well as its need for or pursuit of a capital raise through a secondary equity offering.

122.    As officers and/or directors of a public company, Defendants Bearden and Davidson had a duty to disseminate accurate and truthful information with respect to these topics and to correct promptly any public statements issued by Defendants which had become materially false or misleading.

123.    Due to their positions of control and authority as Hortonworks' CEO/Chairman and CFO, respectively, Defendants Bearden and Davidson was able to, and did, control the contents of the press releases, SEC filings and other public statements which Hortonworks disseminated in the marketplace during the Class Period, as alleged herein.  Throughout the Class Period, they exercised their power and authority to cause Hortonworks to engage in the wrongful acts complained of herein.

124.    Defendants Bearden and Davidson therefore, were both a "controlling person" of Hortonworks within the meaning of Section 20(a) of the Exchange Act.  In this capacity, their participated in the unlawful conduct alleged that artificially inflated the market price of Hortonworks securities.  As Hortonworks' CEO/Chairman and CFO, respectively, they had the power to direct the actions of, and exercised the same to cause, Hortonworks to engage in the unlawful acts and conduct complained of herein.  They exercised control over the general

operations of Hortonworks and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the Class members complain.

125. By reason of the above conduct, Defendants Bearden and Davidson are liable pursuant to Section 20(a) of the Exchange Act, 15 §78t(a), for the violations committed by Hortonworks.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Randall A. Arvidson as Lead Plaintiff, and certifying Mr. Arvidson along with original Plaintiff William Monachelli as Class representatives and their choice of counsel as Lead Counsel;

B. Requiring Defendants to pay, jointly and severally, the damages sustained by Plaintiffs and the Class members by reason of the acts and transactions alleged herein, in an amount to be proven at trial;

C. Awarding Plaintiffs and the other Class members prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: July 28, 2016                    Respectfully submitted,

                                        */s/Jennifer Pafiti*
                                        Jennifer Pafiti (SBN 282790)
                                        **POMERANTZ LLP**
                                        468 North Camden Drive
                                        Beverly Hills, CA 90210
                                        Telephone:     (818) 532-6449
                                        E-mail:        jpafiti@pomlaw.com

                                        Jeremy A. Lieberman
                                        Matthew L. Tuccillo
                                        J. Alexander Hood II
                                        Marc Gorrie
                                        **POMERANTZ LLP**
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone:     (212) 661-1100
                                        Facsimile:     (212) 661-8665
                                        Email:         jalieberman@pomlaw.com
                                                       mltuccillo@pomlaw.com
                                                       ahood@pomlaw.com
                                                       mgorrie@pomlaw.com

                                        Patrick V. Dahlstrom
                                        **POMERANTZ LLP**
                                        10 South La Salle Street, Suite 3505
                                        Chicago, Illinois 60603
                                        Telephone:     (312) 377-1181
                                        Facsimile:     (312) 377-1184
                                        Email:         pdahlstrom@pomlaw.com

                                        *Attorneys for Lead Plaintiff Arvidson and Plaintiff*
                                        *Monachelli and Proposed Lead Counsel*