UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM MONACHELLI, et al._<br><br>Plaintiffs,<br><br>v.<br><br>HORTONWORKS, INC, et al.,<br><br>Defendants. | Case No. 16-cv-00980-SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Re: Dkt. No. 43 |

Now before the Court is defendants' motion to dismiss the First Consolidated Amended Complaint. Dkt. No. 43. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument and VACATES the hearing set for December 9, 2016. For the reasons set forth below, the Court GRANTS defendants' motion to dismiss, with leave to amend.

## BACKGROUND

### I.   Factual Background

The following allegations are taken from the First Consolidated Amended Complaint ("AC"), which the Court must treat as true for purposes of this motion. This matter arose in connection with defendant Hortonworks, Inc.'s secondary equity offering, announced on January 15, 2016. Hortonworks, Inc. (or "the Company") was founded in 2011 and is one of three major "Hadoop" vendors. Dkt. No. 42, AC ¶ 3. Hadoop "is an open source software used to link large numbers of computers into highly efficient large scale data systems." *Id.* ¶ 4. Following its initial public offering in December 2014, Hortonworks is the only Hadoop vendor that is publicly traded. *Id.* ¶ 3. Hortonworks also offers the software products Data Platform, DataFlow, and Sandbox,

1   and provides support, training, and consulting services for these products, from which it derives
2   substantially all of its revenue. *Id.* ¶ 4.

3         As Hortonworks grew, investors and analysts were watching to see how Hortonworks
4   would meet its capital obligations and operating expenses in light of its rapid growth and
5   escalating personnel costs. *Id.* ¶ 5. Meeting those costs without the need for a second public
6   offering "would truly drive up its stock value for existing shareholders." *Id.*

7         The rise in its costs came about as a result of significant business deals, some unplanned,
8   such as the April 2015 partnership with competitor Pivotal Software, Inc., and the acquisition of
9   another large-scale data company, Onyara, in August 2015. *Id.* ¶¶ 5-6, 34. These deals required
10  new hiring and the absorption of new employees. *Id.* ¶ 6. Meanwhile, in October 2015,
11  Hortonworks shifted away from the use of independent contractor consultants to a model utilizing
12  more in-house employees, some of whom could earn $500,000 or more annually with
13  commissions. *Id.* ¶¶ 6, 31. These new expenses, coupled with the fact that Pivotal utilized a
14  "pricing methodology that led to very long delays in payments," meant "skyrocketing operating
15  expenses" for Hortonworks. *Id.* ¶ 6.

16        Five confidential witnesses ("CWs") employed at Hortonworks before and during the
17  August 5, 2015 to January 15, 2016 period ("the Class Period") allege that defendants knew its
18  operating expenses, especially those related to personnel, were straining its available cash. *Id.* ¶ 6.
19  The CWs allege that by October 2015, there were "major concerns" at Hortonworks regarding its
20  cash management. *Id.* ¶ 7. Pressures to seek new capital were rumored in late 2015. *Id.* CW2
21  recalled that sometime before leaving the Company in late November 2015, either defendant
22  Robert Bearden or defendant Scott Davidson announced on an internal "All Hands Call" that the
23  Company would be pursuing a second public offering, and an email to employees announced the
24  same. *Id.* ¶¶ 7, 43.

25        Plaintiffs allege that during the Class Period, "[d]efendants provided a steady stream of
26  false and misleading statements as to the strength of Hortonworks' cash holdings, its revenues and
27  cash being derived from sales to customers, and its ability to meet capital needs from these sources
28  of cash." *Id.* ¶ 8. These statements were made in various forms filed with the Securities and

United States District Court
Northern District of California

2

Exchange Commission ("SEC"), press releases, quarterly earnings teleconferences, and at various conferences. Plaintiffs state that defendants presented the Company's customer expansion, subscription growth, increasing revenue and financial metrics as purely positive and omitted facts and circumstances that would have brought light to the downside impacts of its cash position and its ability to continue meeting its expenses without a secondary equity offering. *Id.* ¶ 50. Plaintiffs allege that "[t]hese statements had their intended effect, driving up or maintaining Hortonworks' stock price" during and after the statements were made. *Id.* ¶¶ 51, 55, 60, 64, 68, 71, 74, 77.

Investors and analysts were surprised when, on January 15, 2016, Hortonworks announced a secondary equity offering for "working capital and other general corporate purposes." *Id.* ¶ 9. As a result of this secondary offering, Hortonworks' stock fell $6.13 (nearly 37%), closing at $10.44 on January 19, 2016, the following trading day. *Id.* ¶ 10.

## II. The Current Matter

Plaintiff William Monachelli filed this securities class action on February 29, 2016. Dkt. No. 1. On June 1, 2016, the Court appointed Randall A. Arvidson as lead plaintiff. Dkt. No. 39. Plaintiffs filed their amended complaint on July 28, 2016, bringing suit against Hortonworks, Inc.; Robert G. Bearden, Chair and Chief Executive Officer of Hortonworks; and Scott J. Davidson, Chief Financial Officer. AC ¶¶ 17-19.

Plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. *Id.* ¶ 12. They allege that defendants made a "series of false and misleading statements, contrary to the facts as then known to them, touting Hortonworks' exploding growth in customers and subscriptions while reassuring investors of its ability to satisfy rising capital needs and personnel costs through existing cash and cash equivalents coupled with cash derived from sales of subscriptions and professional services." *Id.* ¶ 47. Plaintiffs also allege violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against defendants Bearden and Davidson by virtue of their roles as control persons of

Hortonworks. *Id.* ¶¶ 120-125.

On July 28, 2016, defendants filed the present motion to dismiss plaintiffs' First Consolidated Amended Complaint. Dkt. No. 43. On October 27, 2016, plaintiffs filed their opposition. Dkt. No. 47. Defendants filed a reply to the opposition on November 17, 2016. Dkt. No. 48.

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010).

If the court dismisses a complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

4

## II. The Securities Exchange Act of 1934

Section 10(b) of the Securities Exchange Act of 1934 declares it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary . . . ." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) by making it unlawful to "make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5.

A plaintiff asserting a claim under Section 10(b) or Rule 10b-5 must adequately allege six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,* 552 U.S. 148, 157 (2008) (citation omitted); *In re NVIDIA Corp. Sec. Litig.,* 768 F.3d 1046, 1052 (9th Cir. 2014).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section 10(b) complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.,* 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted). As to falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *In re Daou Sys.,* 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted). As to scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness. 15 U.S.C. § 78u-4(b)(2); *In re Daou Sys.,* 411 F.3d at 1015.

The PSLRA provides "a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.,* 353 F.3d 1125, 1132 (9th Cir.2004). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint*

5

*Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 936 (9th Cir. 2003); 15 U.S.C. § 78u-5(i).  The safe-harbor provision does not apply to a description of past or present events.  *No. 84*, 320 F.3d at 936-37.

Section 20(a) of the Securities Exchange Act of 1934 imposes liability on "control persons."  15 U.S.C. § 78t(a).  To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5.  *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993)).

**DISCUSSION**

Defendants move to dismiss plaintiffs' Section 10(b) claim on the basis that the complaint fails to plead falsity, scienter, and loss causation.  Furthermore, defendants argue that plaintiffs attack forward-looking statements accompanied by meaningful cautions, which they argue are protected by the Safe Harbor provision of the PSLRA.  Defendants also move to dismiss plaintiffs' Section 20(a) claim on the grounds that the complaint fails to adequately allege a primary violation under Section 10(b).

**I.    Section 10(b) of the Exchange Act**

**A.    Alleged Misleading Statements**

Plaintiffs argue that, beginning on August 5, 2015, defendants made a series of false and misleading statements during the Class Period that were "contrary to the facts as then known to them . . . ."  AC ¶ 47.  Plaintiffs contend that the "omitted and undisclosed facts and circumstances then-ongoing and then-known to [d]efendants, . . . materially alter[ed] the total mix of information available about Hortonworks" and artificially drove up or maintained stock prices.  *Id.* ¶¶ 50-51, 54-55, 59-60, 63-64, 67-68, 70-71, 73-74, 76-77.

The AC alleges that defendants intentionally made the following false and misleading statements regarding (1) historical data of the Company's performance in the second ("Q2") and third quarters ("Q3") of 2015, (2) the Company's capital requirements as a result of its rapid

6

growth and ability to meet those requirements for the next 12 months, and (3) statements made in November and December 2015 regarding capital needs and the possibility of pursuing a second public offering to meet those needs.

### 1. Statements Regarding Hortonworks' Historical Data and Performance in Q2 and Q3 of 2015

Plaintiffs allege that on August 5, 2015, Hortonworks issued a press release attached to its Form 8-K that stated Hortonworks had cash and cash equivalents as of June 30, 2015, of $30.769 million. *Id.* ¶ 48. The press release also quoted defendant Bearden as stating, "We are very pleased with our second quarter performance which was highlighted by support subscription revenue growth of 178% year-over-year and solid customer momentum with the addition of 119 new support subscription logos." *Id.* On August 6, 2015, during a Q2 earnings teleconference, plaintiffs allege defendants Bearden and Davidson touted a 154% revenue growth, 178% increase in support subscription revenue, and $144 million in total cash plus investments. *Id.* ¶ 49(a).

On November 4, 2015, Hortonworks issued a press release, filed with its Form 8-K that was filed the same day. *Id.* ¶ 57. The press release stated that Hortonworks had cash and cash equivalents of $25.09 million as of September 30, 2015. *Id.* Defendant Bearden again is quoted stating that the Company is pleased with its third quarter performance while highlighting subscription revenue growth of 168% and 152 new support subscription logos. *Id.* Also on November 4, 2015, Hortonworks held its Q3 2015 earnings teleconference. *Id.* ¶ 58. Plaintiffs allege defendant Bearden made false and misleading statements when touting the Company's subscription revenues, growth, and cash on hand, stating, among other things, that "[w]e ended the quarter with $116 million in total cash and investments. Total deferred revenue increased $42 million year-over-year to $90 million as of September 30." *Id.* ¶ 58(a). When an analyst expressed concern over Hortonworks' cash burn rate, Davidson stated, "there was a little bit of lengthening in the DSO [days sales outstanding] over the prior quarter but nothing really out of the ordinary." *Id.* ¶ 58(d).

7

### 2. August and November 2015 10-Q Statements

In its Form 10-Q, filed August 13, 2015, plaintiffs allege that defendants listed Hortonworks' cash and cash equivalents as of June 30, 2015 as $30.769 million. *Id.* ¶ 52(b). The form further stated, "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for the next 12 months." *Id.* ¶ 52(d).

Hortonworks repeated this exact statement regarding its capital sufficiency in its Q3 10-Q filing dated November 12, 2015, while listing its cash and cash equivalents as $25.09 million as of September 30, 2015. *Id.* ¶ 65(b), (d).

### 3. November and December 2015 Conference Statements

On November 11, 2015, Hortonworks attended the RBC Capital Markets Technology, Internet, Media, and Telecommunications Conference. *Id.* ¶ 62. At the conference, when asked about the volatility of Hortonworks stock, Davidson stated:

> We are at $116 million of cash on the balance sheet. . . . [P]eople just assume that, oh, these guys are burning $30 million a quarter - - when, actually, that is not really the case, and that is not what we are indicating on a go-forward basis.

*Id.* ¶ 62(a). According to plaintiffs, during this meeting, Davidson "expressly disclaimed any need by Hortonworks to raise more capital" and made no mention that a secondary offering was under consideration. *Id.* ¶ 62(b). When asked about the cash burn rate, Davidson replied, in part:

> We view that we would have a fully funded model through 2016. . . . [W]e are clearly cognizant of managing cash. . . . If we want to continue to accelerate, we may avail ourselves of a couple different choices on the cash front. But it is an option as opposed to a need. I think that's an important thing to take away.

*Id.*

On November 16, 2015, at the UBS Global Technology Conference, Davidson attended investor meetings, where plaintiffs allege he made more false and misleading statements. When asked about how Hortonworks would sustain its momentum in light of its working capital

8

management constraints and cash balances, Davidson stated, "We have more cash now than we did when we went public" and "we are on pace, if not slightly ahead of pace, with where we've been on guidance for the burn. . . . [S]o when we think about 2016, as we model that out, we will decide sort of where we go and sort of how fast and any capital structure decisions." *Id.* ¶ 69.

On December 1, 2015, Hortonworks attended the Credit Suisse Technology, Media, and Telecom Conference. *Id.* ¶ 72. Defendant Bearden attended an investor meeting and stated that "[w]e have a model that today shows us getting the cash . . . profitability in early 2017. Even with the two acquisitions that we've done, we're very comfortable with that model." *Id.* Bearden further stated, "And with that we have roughly $116 million in cash. It gives us a fully funded model to that point of profitability when you do, you know, when you extrapolate your model, we're somewhere under $50 million in cash. We're comfortable operating on that." *Id.*

On December 9, 2015, Hortonworks attended the Barclays Technology Conference, where Davidson was again asked about Hortonworks' cash burn rate. He stated, in part,

> We said we'd be at breakeven adjusted EBITDA [earnings before interest, taxes, depreciation, and amortization] in [the] first half of 2017. I think depending upon the way your models now work, we end up getting "close" as you say, and we're aware of that. . . . We want to continue to drive the growth rate as we are and so we'll avail ourselves as markets or provide [sic] the opportunity to maybe raise cash in one form or another. And there is a lots [sic] of ways to do that, right. It doesn't have to be a share – straight up equity offering. There is a couple different ways to do that. . . . So when you think about access to capital, it's available. It's a timing thing how we decide if we want to do that.

*Id.* ¶ 75.

Plaintiffs allege that the above statements "were materially false and misleading due to omitted and undisclosed facts and circumstances then-ongoing and then-known to defendants, including as described by the CWs, that by November 2015":

> (a) Hortonworks' rapid growth, including deals with major clients . . ., unplanned investments . . ., and major acquisitions . . . had already necessitated a huge, ongoing personnel expansion . . .;
> (b) these issues were being exacerbated by the "latent revenue" problem arising from Pivotal's contract-based billing structure and by Hortonworks' major decision to convert staffing from largely

9

>independent contractors to paid employees . . .; and (c) these facts were causing significant concerns throughout the Class Period at Hortonworks' highest levels, including Defendants Bearden and Davidson, over management of cash and expenses, leading to "major concerns" by October 2015 that Hortonworks needed more cash, an internal communication in November 2015 that it would pursue a secondary equity offering, and, following public announcement of the offering in mid-January 2016, layoffs by February 2016.

*See, e.g., id.* ¶ 76.

On January 15, 2016, Hortonworks announced it was seeking to raise $100 million in a secondary offering. *Id.* ¶ 80. Plaintiffs allege that this move was "[i]n direct contradiction to Defendants' Class Period statements." *Id.* Reactions to this news were "swift and harsh." *Id.* ¶ 81. On January 19, 2016, the next trading day, Hortonworks' stock fell nearly 37% ($6.13 per share), to close at $10.44. *Id.* ¶ 82.

### B. Falsity

Plaintiffs allege that defendants made false and misleading statements during the Class Period by touting Hortonworks' growth and the strength of its cash position while omitting facts and circumstances that could have shed light on the strain its rapid growth was having on its cash sources. Defendants argue that plaintiffs do not plead any particularized facts showing that the statements were false when made.

In order to show falsity, the complaint must state with particularity each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. 15 U.S.C. § 78u-4(b)(1); *In re Daou Sys.*, 411 F.3d at 1014 (citation omitted). Furthermore, in order for a securities fraud claim to be actionable, a statement or omission "must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).

In *Jasin v. Vivus, Inc.*, plaintiffs brought a securities fraud claim and challenged defendants' statements that Vivus, a biopharmaceutical company, had enough funds "to take [the new drug] through the FDA approval process and that Vivus would raise capital 'at some time.'"

No. 14-cv-03263-BLF, 2015 WL 3809357, at *9 (N.D. Cal. June 28, 2015).  The day after making these statements, Vivus "announced a public stock offering."  *Id.*  There, the court dismissed the complaint, finding that "Plaintiffs' allegations do not support the conclusion that Defendants materially misled the public in stating that they would soon seek to raise more capital when they, the day after making the statement, sought to raise capital."  *Id.*  Furthermore, the *Jasin* court held that "Plaintiffs' argument that [defendant] was obligated to inform the public that Vivus would make a public offering the next day is unsupported in the case law."  *Id.* (citing *Brody*, 280 F.3d at 1006).

Here, defendants sought a second public offering roughly six weeks after the final alleged misleading statement.  Plaintiffs nowhere allege that defendants stated they would not pursue a second public offering.  Indeed, plaintiffs allege that defendants acknowledged that the Company may in the future raise more cash, and investors and analysts repeatedly questioned defendants regarding cash burn.  *See, e.g.,* AC ¶¶ 62(b), 72, 75.  Therefore, even taking as true CW2's allegation that sometime before the end of November 2015 defendants internally announced their intent to pursue a secondary offering, the statements that plaintiffs target do not demonstrate falsity.  Regarding defendants' November and December 2015 statements at various conferences about capital needs, plaintiffs allege these statements were false and misleading because defendants "had no credible basis for their stated comfort level operating on Hortonworks' cash position" and did not disclose that they were "planning a secondary offering that would be announced and . . . filed with the SEC in *just six weeks*."  *Id.* ¶¶ 70, 73, 76.  However, as in *Jasin*, plaintiffs here have failed to show that defendants were required to inform the public regarding a secondary offering any sooner than they did, and plaintiffs have failed to identify with particularity how defendants materially misled the public.

Moreover, plaintiffs have not alleged that any of the figures contained in defendants' statements on August 5-6 and November 4, 2015, regarding historical performance were false.  Plaintiffs instead rely on the argument that defendants "touted" these financial results without exposing "the downside impacts of that growth on Hortonworks' strained cash position."  *Id.* ¶¶ 50, 54, 59, 67.  However, "disclosure[s] of accurate historical data accompanied by general

11

statements of optimism" and "failure to disclose internal forecasts of future performance" are not actionable. *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507 (9th Cir. 1991)).

The Court thus agrees with defendants that plaintiffs have failed to identify with particularity any false or misleading statements. For this reason, the Court GRANTS defendants' motion to dismiss, with leave to amend.

### C. Safe Harbor

The Court further agrees with defendants that certain of the alleged misstatements are forward-looking statements entitled to the protection of the PSLRA's safe harbor provisions. These include defendants' statements in the August 13 and November 12, 2015 10-Qs: "We believe that our existing cash and cash equivalents balance, together with cash generated from sales of our support subscriptions and professional services to customers, will be sufficient to meet our working capital and capital expenditure requirements for the next 12 months." *See* AC ¶¶ 52(d), 65(d).

> A forward-looking statement qualifies for the PSLRA "safe harbor" and is not actionable if either of the following two conditions is true: (A) the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) plaintiffs fail to establish that the statement was "made with actual knowledge . . . that the statement was false or misleading."

*In re iPass, Inc. Sec. Litig.,* No. 05-0228-MHP, 2006 WL 496046, at *5 (N.D. Cal. Feb. 28, 2006).

In their motion, defendants argue that, immediately following the statements that plaintiffs challenge, Hortonworks provided cautions regarding the risk. These cautions included that "[o]ur expected future capital requirements may depend on many factors . . . . We may be required to seek additional equity or debt financing in order to meet these future capital requirements." Mot. at 11 (citing Ex. E at 24, Ex. I. at 26).[1] Additionally, the 10-Qs warned, "As a result of our limited

---

[1] Defendants request the Court to take judicial notice of documents referenced in the AC

12

operating history, our ability to forecast our future results of operations is limited and subject to a number of uncertainties, including our ability to plan for an model future growth." Ex. E at 27, Ex. I at 29.  They further stated that "we may need to engage in equity or debt financings to secure additional funds.  If we raise additional funds through future issuances of equity or convertible debt securities, our existing stockholders could suffer significant dilution . . . ." Ex. E at 39, Ex I. at 41.

The Court finds these cautionary statements meaningful because they address defendants' liquidity projections by warning about the possibility of raising additional capital through an equity, debt financing, or investment in order to support the Company's growth.  *See also Garcia v. Hetong Guo*, No. 15-cv-1862-MWF, 2016 WL 102213, at *9 (C.D. Cal. Jan. 7, 2016) (finding the statement "[w]e expect that our current cash and cash equivalents and cash flow from operations will be sufficient to meet our anticipated cash needs for working capital and certain capital expenditures for the next 12 months, and we may seek financing to fund additional capital expenditures" to be forward-looking).  Because the liquidity predictions in the August and November 2015 10-Qs are protected by the Safe Harbor provision, the Court finds these statements are additionally not actionable.

---

that are attached as exhibits to the Motion to Dismiss and to the Reply.  Dkt. Nos. 45, 50.  Plaintiffs oppose the Court's taking judicial notice of Exhibit O, because it falls outside the Class Period, and of any records containing versions of documents or transcripts with language that differs from the quoted passages in the AC.  Dkt. No. 46 at 1-2.  A court may "consider unattached evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the document." *United States v. Corinthian Colleges,* 655 F.3d 984, 998-99 (9th Cir. 2011).  "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Info. Sys., Inc. Sec. Litig*., 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citation omitted).

Other than Exhibit O, these requirements are satisfied here.  The Court does not rely on Exhibit O in issuing today's ruling.  Further, to the extent the other exhibits contain versions of documents or transcripts with language differing from the quoted passages in the AC, the Court will not take notice.  The Court therefore GRANTS IN PART defendants' request for judicial notice, with the exception of Exhibit O and any documents or transcripts that differ from the language quoted in the AC.

13

### D. Scienter

Defendants also move to dismiss the AC as failing to sufficiently plead scienter, arguing that the CWs lack personal knowledge of the relevant facts and that their statements are not indicative of scienter. Mot. at 20. Plaintiffs contend that defendants "made the materially false and misleading statement[s] and omissions constituting the fraud at issue with full knowledge of their falsity due to contrary facts, evidenced by numerous CWs and documentary evidence, which were undisclosed to investors." AC ¶ 98.

"To adequately plead scienter, the complaint must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991 (citing 15 U.S.C. § 78u-4(b)(2)). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 324 (2007). "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (internal quotation marks and citation omitted). Moreover, a complaint depending on statements from confidential witnesses to establish scienter must pass two hurdles to satisfy the PSLRA's pleading requirements: "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge" and "[s]econd, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* at 995 (citations omitted).

The Supreme Court has explained that the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. When conducting this holistic review, courts must "take into account plausible opposing inferences" that could weigh against a finding of scienter. *Id.* at 323. "Even if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006.

14

Plaintiffs rely on statements from five CWs and the January 15, 2016 second equity offering announcement to support their claim that defendants knew their statements were false when they were made and acted with the requisite scienter. CW1 was a Strategic Accounts Director at Hortonworks from June 2014 to February 2016. AC ¶ 21. CW1 participated in numerous "All Hands Calls," during which "Davidson spoke to Hortonworks' goals, and managing expenses was always a top concern." *Id.* ¶ 29. CW1 stated that Hortonworks used Salesforce.com as its accounting system to record sales and business expenses. *Id.* ¶ 30. CW1 stated that the cash burn rate was therefore visible and readily accessible to high-level employees like Davidson and Bearden. *Id.* CW1 witnessed escalating costs, the "latent revenue" issue as a result of the Pivotal deal, and rapid growth in personnel, and "said that Hortonworks executives were aware of the cost of this hiring model." *Id.* ¶¶ 31-37.

CW2 was the Senior Global Manager for Customer Relations at Hortonworks from February 2015 to December 2015. *Id.* ¶ 22. CW2 alleges that either defendant Bearden or Davidson announced before CW2 left Hortonworks at the end of November in 2015 that Hortonworks intended to pursue a second public offering of stock to raise capital. *Id.* ¶ 43. CW2 remembers the news coming in an email to employees and during an "All Hands Call." *Id.*

CWs 3, 4, and 5 "corroborate the scope and timing of Hortonworks' hiring spree." *Id.* ¶ 38. CW3 was a Senior Director for Corporate Development from May 2014 to February 2016, and CW4 was a Communications Manager from September 2015 to February 2016. *Id.* ¶¶ 23-24. Both CW3 and CW4 observed a large expansion of staff in order to service accounts. *Id.* ¶ 38. CW5, Senior Global Payroll Manager from November 2015 to April 2016, witnessed a low attrition rate and the firing of 50-100 employees a month from various departments, while the Company opened new office locations in the U.S. and internationally. *Id.* ¶¶ 25, 38.

Here, the Court finds that plaintiffs have failed to allege scienter either through individual allegations or holistically. Defendants argue that "none of the CWs state that Hortonworks' predictions about its working capital, capital expenditures, and revenue were unreasonable when made" nor were the CWs "in a position to do so; none of them worked in finance, and none of them had any role in preparing Hortonworks' projections." Mot. at 1. The Court agrees.

Although the CWs' positions at the Company exposed them to the Company's state of rapid growth and increased expenses, their allegations do not adequately establish that any of the statements made by defendants during the Class Period were false, let alone made with the intentional or deliberately reckless state of mind. Moreover, the CWs' allegations are not at least as cogent and compelling as a plausible alternative inference, namely that defendants "decided to raise additional capital to fuel further expansion of their business." *See* Mot. at 24.

For this additional reason, the Court GRANTS defendants' motion to dismiss, with leave to amend.

### E. Loss Causation

Lastly, defendants argue that plaintiffs' Section 10(b) claim should be dismissed for failure to plead loss causation because plaintiffs have failed to plead with specificity any corrective disclosures revealing that the challenged statements were false and misleading when made. Having agreed with defendants above that plaintiffs have failed to plead with particularity any false or misleading statements, the Court will not reach defendants' loss causation argument at this time.

## II. Section 20(a) of the Exchange Act

Defendants also seek to dismiss plaintiffs' Section 20(a) claims, brought against defendants Bearden and Davidson on a "control person" theory of liability. To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5. *Lipton*, 284 F.3d at 1035 n.15.

As plaintiffs have not adequately alleged a primary violation under Section 10(b), their Section 20(a) claims also fail at this time. The Court GRANTS defendants' motion to dismiss the Section 20(a) claims, with leave to amend.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendants' motion to dismiss the First Consolidated Amended Complaint, with leave to amend. Any amended complaint must be filed no later than January 6, 2017.

**IT IS SO ORDERED**.

Dated: December 5, 2016

_____
SUSAN ILLSTON
United States District Judge